UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CLAUDIA DIFOLCO,

        Plaintiff,

    v.

MSNBC CABLE L.L.C., RICK KAPLAN,
SCOTT LEON, and CASSANDRA BROWNSTEIN,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

           06 CV 4728 (LAP)

## DECLARATION OF JULIE RIKELMAN IN SUPPORT OF MSNBC CABLE L.L.C.'s MOTION TO DISMISS COMPLAINT

       JULIE RIKELMAN, under penalty of perjury and pursuant to 28 U.S.C. § 1746 declares as follows:

    1. I am Litigation Counsel for NBC Universal, Inc. and attorney for Defendant MSNBC Cable L.L.C. in this action. I am familiar with all of the facts and circumstances set forth in this Declaration. I submit this declaration in support of MSNBC Cable L.L.C.'s motion to dismiss the Complaint.

    2. Attached hereto as Exhibit A is a true and accurate copy of the employment contract between Plaintiff Claudia DiFolco and Defendant MSNBC Cable L.L.C., with an effective date of January 17, 2005.

    3. Attached hereto as Exhibit B is a true and accurate copy of the correspondence between Claudia DiFolco and MSNBC President Rick Kaplan, dated August 23 to August 31, 2005, and referenced in the Complaint at paragraphs 37 to 44.

4.   Attached hereto as Exhibit C is a true and accurate copy of the introductory page for the "Watercooler" message board on the TVSpy website, referenced in the Complaint at paragraphs 53-54.

Dated:  June 27, 2006
            New York, New York

_Julie Rikelman_
Julie Rikelman

**EXHIBIT A**

One MSNBC Plaza
Secaucus, NJ 07094
201 583-5000



December 2, 2004 (as of January 17, 2005)

Ms. Claudia DiFolco
c/o Ken Lindner, Esq.
Ken Lindner & Associates
2049 Century Park East, Suite 2750
Los Angeles, CA 90067

Dear Ms. DiFolco:

The following letter agreement and the attached Standard Provisions (collectively referred to as the "Agreement") will confirm the understanding between you ("Artist") and MSNBC Cable L.L.C. ("MSNBC"), with respect to the terms and conditions of your employment and shall supersede all prior oral or written understandings and agreements between MSNBC and Artist. The parties agree as follows:

1. MSNBC hereby agrees to employ Artist on a staff/contract basis during the term hereof to render services as an anchor/co-anchor, commentator, correspondent, reporter and/or analyst and in any other like capacity for MSNBC or MSNBC programming as assigned by MSNBC from time to time. Artist also agrees to accept temporary or trial assignments including substituting when others are on vacation or absent due to illness or work assignment or emergencies, as MSNBC may direct.

2. Artist hereby agrees to accept the employment provided for and will complete and perform all of the agreements and obligations entered into by Artist hereunder.

3. Programs may be produced live or prerecorded, as MSNBC may determine and may be distributed in any manner whatsoever. Artist's services shall be performed at such times and places during the term as MSNBC may designate. Artist's base of operations is currently scheduled to be in the greater Los Angeles, CA metropolitan area. Subject to Artist's consent, MSNBC may change such base of operations, whether in the United States or abroad, at any time and from time to time during the term by written notice to Artist setting forth such new base of operations.

4. (a)  The term of this Agreement shall commence on January 17, 2005 and shall continue, subject to suspension, extension or termination as hereinafter provided, for a period of one hundred and four (104) consecutive weeks thereafter. The term hereof shall be divided into two (2) consecutive cycles of fifty-two (52) weeks each. MSNBC shall have the right to terminate this Agreement effective at the end of the first cycle by giving Artist written notice not less than sixty (60) days prior to the end of such cycle. This Agreement shall automatically terminate at the end of the second cycle without notice, unless the parties agree otherwise.



(b) In the event that Artist is officially promoted and regularly assigned as host/co-host of any of MSNBC's regularly scheduled programs, or if Artist is officially and regularly assigned to perform on-air services for NBC's "Today Show" program, Artist's compensation shall be negotiated in good faith. Notwithstanding this obligation to renegotiate, Artist shall at all times be obligated to continue performing the assigned functions and duties provided for under this Agreement.

5. (a) As full compensation for the services to be rendered by Artist hereunder and in consideration of the rights granted by Artist and subject to full performance by Artist of Artist's obligations, Artist's earnings hereunder shall be as follows:

| Period of Term | Annual (Bi-Weekly Compensation |
|---|---|
| 01/17/05 – 01/15/06 | $120,000.00 ($4,615.38) |
| 01/16/06 – 01/14/07 | $145,000.00 ($5,576.92) |

(b) For certain payroll and GE benefits purposes, the bi-weekly compensation set forth in paragraph 5(a) above will result in the following annual compensation being reflected in some calculations and/or reports:

| Period of Term | Annual Compensation |
|---|---|
| 01/17/05 – 01/15/06 | $120,385.00 |
| 01/16/06 – 01/14/07 | $145,465.00 |

(c) In addition to the compensation in paragraph 5(a) above, Producer shall pay Artist an additional fee of Five Hundred Dollars ($500.00) for each day on which Artist is assigned by MSNBC, and performs services, as a fill-in host for MSNBC's entertainment program.

6. Artist agrees to sign this Agreement and satisfy all pre-employment requirements prior to the commencement of staff employment with Producer as set forth in Paragraph 4. Failure to comply fully with the foregoing sentence shall suspend commencement of the one hundred and four (104) week term hereof until such time as those requirements have been satisfied. However, this Agreement shall be contingent upon Artist's ability to obtain appropriate Visa status approval, and will not become effective until said approval is obtained. MSNBC will work with Artist to facilitate the Visa approval and will cover reasonable costs involved in the hire of Artist under this Agreement. If Artist does not obtain appropriate Visa status approval within a reasonable time period for the purposes of this Agreement, the Agreement shall be null and void. Moreover, this Agreement (and MSNBC's obligations therein) is expressly conditioned on Artist's continued ability to obtain and/or maintain her requisite compliance with federal immigration laws.

7. Artist shall be considered a staff/contract employee of MSNBC and shall be entitled to such employee benefits, as may be in effect for personnel similarly classified. Artist shall abide by company policies of MSNBC, including the policies of the NBC News Division.



8. Artist shall be entitled to vacation to be administered in accordance with MSNBC's company policy. The scheduling of such vacation shall be mutually agreed upon between MSNBC and Artist, but in the event of a failure to agree, MSNBC shall designate the vacation period, and endeavor to accommodate Artist.

9. This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, all prior understandings being merged herein. In the event of any inconsistency between this letter agreement and the Standard Provisions, this letter agreement shall prevail. All questions with respect to this Agreement shall be determined in accordance with the internal laws of the State of New York. The Agreement may not be changed, modified, renewed, extended or discharged except as specifically provided herein or by an agreement in writing signed by the parties hereto.

IN WITNESS WHEREOF the parties hereto have executed this Agreement as of the date aforesaid.

Very truly yours,
MSNBC CABLE L.L.C.


By: _____
    Richard Kaplan

ACCEPTED AND AGREED:


_____
Claudia DiFolco

DiFolco04

## STANDARD PROVISIONS

| | | |
|---|---|---|
| **Name:** | Claudia DiFolco | ("Artist") |
| **Division:** | MSNBC | ("Company") |
| **Date:** | December 2, 2004 | (as of January 17, 2005 ) |

### 1. Services.

(a) Artist's services hereunder shall be performed under Company's direction and control and in a competent, painstaking and artistic manner and to the best of Artist's ability and shall include any necessary rehearsals. Artist will be available to devote sufficient professional time and attention to the performance of Artist's services hereunder as required by Company and will, subject to specification of base of operations, if any, render such services at the times and places designated by Company and in the manner specified and required by Company. Company may require Artist to conform to reasonable standards as may from time to time be set by Company pertaining to matters of on-air professionalism, including behavior, appearance and related matters. Artist agrees to perform in openings, closings, lead-ins, lead-outs and promotional announcements (other than by way of non-NBC advertiser product endorsement) without additional compensation except to the extent, if any, required by any applicable collective bargaining agreement to which Company is a party. The services and the material, if any, furnished by Artist shall comply with all of Company's rules and policies, including but not limited to the then applicable news policies and/or guidelines, and with the rules and regulations of the Federal Communications Commission and any other governmental body having jurisdiction in the premises. Any material furnished by Artist shall be subject to Company's approval; without limiting the generality of the foregoing, Artist shall not, without Company's approval, mention or make any reference, or allow such mention or reference to be made, to any product or service in any program hereunder other than that of a sponsor of such program except as may be required for bona fide news reporting and comment.

(b) Artist agrees that no public statement by Artist, or by any representative of Artist (to the extent such statements are reasonably subject to control by Artist), whether spoken or in writing, telecast or not, will be disparaging to, or derogatory of, the sponsor or sponsors of any materials produced hereunder, or of any product or services of any such sponsor or sponsors, or of Company, its parent or affiliated or subsidiary companies, and their respective services, products, officers, directors, employees or

agents or of Artist's services, performances or Artist's relationship to Company, except as may be required for bona fide news reporting and comment in Company's programming services and under its direction and control. Artist agrees that in the event of breach of the foregoing provisions of this paragraph, Company will have the right to terminate this agreement upon written notice (no later than thirty (30) days after learning of such statement) and/or to seek appropriate injunction relief in a forum of competent jurisdiction upon notice and hearing, it being agreed that any remedy at law will be inadequate. Artist's obligations under this paragraph shall survive termination. The right of termination set forth in this paragraph is in addition to, not in lieu of, any other rights Company may have at law or in equity.

(c) Upon reasonable prior notice, Artist agrees to perform reasonable promotional activities on behalf of Company such as in connection with Company's programs, services and community activities which may include, but not be limited to, on-air interviews, guest appearances, community appearances and institutional, sales, or similar meetings, all without additional compensation except to the extent, if any, required by any applicable collective bargaining agreement to which Company is a party. Artist will be reimbursed for reasonable expenses directly incurred by Artist in connection with these appearances. Artist shall not be permitted to appear in promotions or advertisements for any product or service, or allow Artist's name or likeness to be so used, whether or not Artist is compensated, without the approval of Company in each instance.

(d) Subject to the limitation, if any, imposed by any applicable collective bargaining agreement to which Company is a party, to the extent that the compensation payable to Artist for any services, including services on an entertainment program, furnished by Artist is in excess of applicable union minimum scale, Company shall have the right to apply such excess against any and all payments which would otherwise be due at any time under any collective bargaining agreement with respect to services by Artist or the exercise by Company of rights granted by Artist to Company hereunder.

(e) To maintain the integrity of business and financial reporting, and to comply with

2

applicable laws and regulations, Company, or one or more of its divisions, subsidiaries or affiliated entities may have established special policies and procedures concerning the financial investments and holdings of its employees. Artist will strictly comply with all such policies and procedures and the failure to do so shall be deemed sufficient grounds for immediate termination of this Agreement

## 2. Ownership, Use and Sponsorship.

(a) Artist hereby expressly grants perpetually and exclusively to Company all rights of any kind and character whatsoever, including, without limitation, all common law, statutory and moral rights throughout the world and regardless of whether or not such rights are now known or hereafter discovered, in and to Artist's services and performances pursuant to this agreement and in and to the results and proceeds of such services and performances. The foregoing rights shall include, but not be limited to, the perpetual and unlimited right to use, disseminate, exploit, reproduce, record, display, and publicly perform by any process whether now known or hereafter discovered, any or all of Artist's acts, poses, plays, services and appearances in or in connection with the programs, program materials and services and promotional trailers created hereunder and Artist's voice and all sound effects produced by Artist in connection therewith, and the complete and unencumbered right, throughout the world, to exhibit, record, reproduce, telecast, transmit, publish, sell, license, distribute, perform and use for any purpose, in any manner, by any means and in television, sound radio, new media, interactive media and any other medium now known or hereafter discovered all or any part or parts of the matter and things referred to in this paragraph. Artist shall not have or claim to have any right, title or interest in or to any material embodied in any program or other material produced hereunder, including, without limitation, the title, format, plots, ideas, research, scripts, graphics, action, character, name of any character, characterizations, locales, routines, costumes, music or other effects thereof, regardless of any contributions thereto made by Artist. Notwithstanding the foregoing, Company will not use, exhibit, record, reproduce, telecast, transmit, publish, sell, license or distribute "outtakes" of Artist's performances produced pursuant to this agreement which outtakes Company may reasonably anticipated to subject Artist to embarrassment or ridicule, without Artist's prior written approval.

(b) It is further mutually agreed that all works produced by Artist within the scope of Artist's employment by Company were specially ordered and commissioned as part of an audiovisual work and, as such, will be considered a "work made for hire" within the meaning of the U. S. Copyright Law. If any such works do not qualify as a "work made for hire" for any reason, all rights specified in this paragraph will be deemed transferred by this agreement to Company, its successors and assigns.

(c) Artist consents to the use of excerpts of Artist's performance from a program in other programs, and in other media, specifically including, but not limited to, programs covered by the provisions of subparagraphs 8 and 10 of paragraph 73(d) of the AFTRA Network Television Code so long as meaning and content are not distorted. Artist further consents to any and all uses of Artist's services and performances in what are defined as "Supplemental Markets" under any applicable AFTRA Code.

(d) Company (or any licensee of Company) shall have the exclusive right to enter into agreements for the commercial sponsorship of any program or of any segment or portion thereof. Artist shall not, directly or indirectly, have any right or interest in or to any such agreement.

## 3. Confidentiality.

Artist agrees that during the period of Artist's employment and thereafter, Artist will not, without the express consent of Company, disclose or use any confidential information, it being understood that the term "confidential information" shall mean all information not known to the general public concerning Company, which is received by Artist during Artist's employment with Company. Artist further agrees to keep the terms and conditions of this agreement (and any aspects of any dispute or arbitration relating thereto) confidential; provided, however, Artist may disclose such information as required by law and to those persons employed by Artist who require access to such information in connection with their employment and are subject to comparable confidentiality proscriptions by virtue of their relationship to Artist. Artist agrees that in the event of an actual or attempted breach of confidentiality, Company will have the right to terminate this agreement upon written notice and/or to seek appropriate injunction relief in a forum of

3

competent jurisdiction upon notice and hearing, it being agreed that any remedy at law will be inadequate. In the event of a threatened breach of confidentiality, Company will have the right to seek appropriate injunction relief in a forum of competent jurisdiction upon notice and hearing, it being agreed that any remedy at law will be inadequate. Artist's obligations under this paragraph shall survive termination.

**4. Use of Name and Likeness.**
Company shall have the exclusive worldwide right and license to use or exploit of Artist's name, sobriquet, approved biography, picture, portrait, recorded voice, performance, caricature and likeness, or any one or more of them in connection with Artist's duties hereunder in any medium now known or hereafter discovered for informative purposes and in connection with the advertising and publicizing of any materials created hereunder and/or Company's services but not (except with Artist's prior written consent) as an advertiser product endorsement of any non-NBC product or service. Subject to Artist's consent, Company or any station telecasting the materials created hereunder may (but has no obligation to) open mail addressed to Artist in its care and may reply in the name of Artist or otherwise to any of that mail which relates to the programs or services hereunder and may affix a facsimile of Artist's signature to such replies. Any mail so opened that does not relate to the programs or services hereunder or which relates personally to Artist, will be forwarded to Artist. In the event Artist withholds consent regarding mail, Artist shall reply, or forward such mail to Company to reply, in a timely and appropriate manner.

**5. Exclusivity.**
(a) If Artist is a staff employee, Artist recognizes that, unless otherwise specified, the employment hereunder is a full-time employment and that Artist's other activities must be such as never to cast doubt on the fairness or objectivity of Company and its News Division or reflect unfavorably upon Artist or Company. Accordingly, during the period of Artist's staff employment by Company: (i) Artist will render services exclusively to and for Company and Artist will not render any services to others, or on Artist's own behalf, directly or indirectly, in any capacity or medium now known or hereafter discovered (including, without limitation, granting rights to use Artist's name, likeness, voice and the like, or to use any performance or other services which Artist rendered for others prior to this agreement); (ii) Artist shall not negotiate concerning such

services with other than Company prior to the expiration of the term hereof, except as may be expressly provided herein; and (ii) any and all of Artist's business or public activities shall be subject to Company's prior approval, after disclosure by Artist of full details with respect thereto, but in no event shall any such activities interfere with Artist's obligations to Company.

(b) If, on the other hand, Artist is a non-staff, freelance employee, Artist agrees that Artist's activities must be such as never to cast doubt on the fairness or objectivity of Company or reflect unfavorably upon Artist or Company. Accordingly, during the period of Artist's freelance employment by Company, any business or public activities of Artist which a reasonable person might think could conflict with such Policies and Guidelines or create a possible conflict of interest shall be subject to Company's prior approval, not to be unreasonably withheld, after disclosure by Artist of full details with respect thereto, only for the limited purpose of ensuring that the provisions of this paragraph and Company's News Policies and Guidelines are not compromised or violated and to preclude any possible conflict of interest. In no event shall any such activities interfere with Artist's obligations to Company.

**6. Merchandising.**
Company shall have the exclusive merchandising and commercial tie-up rights in connection with any television, sound radio or new media materials produced hereunder, or any part thereof, including materials which incorporate Artist's name, sobriquet, approved biography, picture, portrait, voice, performance, caricature and likeness in connection with Artist's duties hereunder. However, if the way in which Company wishes to exercise such rights depicts Artist in a manner inconsistent with Artist's original performance(s), Company must secure Artist's written consent, such consent not to be unreasonably withheld. Company must also secure consent, not to be unreasonably withheld, for the sale of ancillary merchandise caused to be made by Company which is specifically based upon Artist's name, sobriquet, approved biography, picture, portrait, performance, voice, caricature and/or likeness.

**7. Failure to Perform.**
(a) This agreement shall terminate automatically on the death of Artist.

4

(b) This Agreement and Artist's performance of services hereunder is expressly subject to Company's Short-Term Sickness or Injury and Medical Disability policies and applicable law and provides Artist with no greater rights than such policies with respect to the subject matter covered by such policies.

(c) If Artist fails or refuses to perform Artist's obligations under this agreement for any reason other than an injury, illness or condition covered by Company's Short-Term Sickness or Injury and Medical Disability policies, Company shall have the right to suspend its obligation to pay Artist during the period of such failure or refusal to perform and Company may, but shall not be obligated to, extend the term of this for a period equal to all or any part of the period or aggregate of periods of such suspension. Company may exercise any or all of such rights at any time during the continuance of such any refusal of Artist to perform services hereunder up until the scheduled end date of this agreement; and Company may also terminate this agreement, whether or not it has previously exercised any of the rights specific herein.

(d) If Artist performs services on-air and suffers any infirmity which materially detracts from Artist's appearance or voice and such infirmity exists for a period in excess of four (4) weeks, Company may thereafter terminate this agreement by written notice to Artist.

(e) Company may terminate this agreement in the event of Artist's breach of any material representation, warranty, term or condition of this agreement; provided, however, that prior to any termination under this provision, Company will provide Artist with written notice setting forth the elements of the breach and give Artist the opportunity to cure the breach, if such cure is timely and possible, to the satisfaction of Company.

## 8.  Public Morals, etc.
If Artist commits any act or becomes involved in any situation, or occurrence, which brings Artist into public disrepute, contempt, scandal or ridicule, or which justifiably shocks, insults or offends a significant portion of the community, or if publicity is given to any such conduct, commission or involvement on the part of Artist which occurred previously, Company shall have the right to terminate this agreement within a reasonable period of time after Company

actually learns of such act, situation or occurrence.

## 9.  Force Majeure.
In the event that, due to labor disputes, government regulations, or because of the failure of telecasting facilities due to war or other calamity, or because of other conditions beyond Company's control (all collectively referred to as "force majeure"), Company is unable to fully utilize Artist's services for a period in excess of two (2) consecutive weeks, Company shall have the right to suspend Artist's services for the remainder of the duration of such force majeure, or for any part thereof, and no compensation will be paid or accrued to Artist during any such period of suspension; provided that such suspension shall end as soon as such force majeure terminates. When, in the aggregate, suspensions pursuant to this paragraph during the term of this agreement exceed four (4) weeks in duration, Company shall either reinstate Company's continuous obligation to pay Artist pursuant to this agreement, on a non-retroactive basis, or terminate this agreement.

## 10.  Effect of Termination or Suspension.
Termination or suspension of this agreement shall not affect Company's and Artist's respective rights and obligations hereunder with respect to any services that Artist has theretofore performed.  Use of Artist's services by Company after termination of this agreement, whether or not in the same or similar capacity or programs, shall not be deemed a reinstatement of this agreement without the written agreement thereto by both Company and Artist.  For any termination, other than for cause, Company shall pay Artist for any accrued, but unpaid, compensation, including unused vacation and any vested benefits in accordance with Company's benefit plan(s) and unreimbursed authorized expenses.

## 11.  Travel and Other Expenses.
(a) Company shall reimburse Artist for reasonable and authorized out-of-pocket expenses actually and necessarily incurred in the performance of Artist's assigned duties, in accordance with Company policies and procedures.

(b) Unless prevented from doing so by virtue of Artist's work assignment, Artist agrees to settle any cash advances within thirty (30) days after such advance is made and Artist expressly recognizes that it is in Artist's overall best

5

interests and as such, authorizes, Company to deduct, withhold, or offset from wages or other monies due to Artist any such advances not so settled to the extent permitted by law; this shall be in addition to other rights Company may have to recoup the advance.

(c) Except as may otherwise be provided herein, all travel shall be in accordance with Company's prevailing policies.

(d) When required to move by Company during the term of this agreement, Artist shall be paid relocation expenses in accordance with Company's relocation policy, then in effect.

### 12. Pay or Play.

Company has no obligation to produce, present or exploit any program or to utilize Artist's services or any material furnished by Artist, but Company shall have the right, notwithstanding anything to the contrary herein contained, to discharge fully its obligations by paying Artist the minimum guaranteed compensation provided for herein for the period of time during which this agreement is in effect.

### 13. Payments.

All payments to Artist hereunder are subject to deductions and withholdings required or authorized by law.    Even if expressed in annualized figures, Artist's base compensation shall be paid, as required, in bi-weekly amounts (unless otherwise specified) during the term unless the term is suspended as permitted hereunder.   If pursuant to legal process and upon notice to Artist, Company is ordered to make any payment due Artist hereunder to some person other than Artist, payment in accordance with such legal process shall discharge Company's payment obligations to Artist hereunder.   Artist affirms that the sums payable to Artist hereunder include all fees and commissions and Artist agrees to indemnify Company against any claims for fees or commissions by an agent or representative of Artist or by any other person or entity with respect to this agreement.

### 14. Warranties and Representations.

Artist represents and warrants that:

(a) Artist has the right to enter into this agreement and to grant the rights herein granted, that Artist neither has made nor will make any contractual or other–commitments which would conflict with the performance of Artist's obligations hereunder or the full enjoyment by Company of the rights herein

granted and that Artist will neither do acts nor enter into commitments in derogation of the rights granted hereby;

(b) Artist is a citizen of the U.S. or an alien qualified to work in the U.S. in the capacity set out in this agreement;

(c) Artist has attained the age of majority in the jurisdiction in which Artist will perform services hereunder.   However, if Artist is a minor, the approval of Artist's legal guardian to the terms of this agreement is required and is hereby given; and

(d) All material created by Artist hereunder shall be Artist's original work and that Company's use thereof shall not infringe upon or violate the rights of any person or entity.

### 15. Indemnities.

Company shall defend, indemnify and hold harmless Artist from and against any and all liability, actions, claims, demands, loss, expense or damage (including reasonable attorneys' fees) caused by or arising out of any action, performance or utterance by Artist on or in connection with any program or services hereunder, provided that such action, performance or utterance by Artist was of or with respect to material furnished by Company or was done by Artist under Company's direction, supervision and control and done in the course of Artist's duties to Company under this agreement or was otherwise authorized by Company; except, however, Company's indemnity shall not apply with respect to matters where Artist has been grossly negligent or intentionally violated the rights of Company or of any third party unless at the direction of Company, or where Artist fails to cooperate fully with Company in the Company's defense of any claim, demand or action.   In such case where Artist's unauthorized action, utterance or use of unauthorized materials causes Company to incur liability or costs or where Artist has been grossly negligent or intentionally violated the rights of Company or of any third party unless at the direction of Company, Artist shall defend, indemnify and hold harmless Company, its parent, subsidiary and affiliated entities, and their respective officers, directors, agents and employees, the stations and other licensees using or presenting the programs hereunder, any other entity authorized by Company to use the materials produced hereunder, any sponsor of said materials and its advertising agency, and their respective officers, directors, agents and employees, from and against any and all

6

liability, actions, claims, demands, loss, expense or damage (including reasonable attorneys' fees). During the period of Artist's employment with Company and thereafter, Artist agrees to cooperate fully with Company in Company's participation in any administrative, judicial or other legal or quasi-legal proceeding.

### 16. Unique services, relief.

It is agreed that the services and material (if any) to be furnished by Artist and the rights granted by Artist hereunder are of a special, unique, unusual, extraordinary and intellectual character which gives them a peculiar value, the loss of which cannot be adequately or reasonably compensated by damages in an action at law and that Artist's failure to perform Artist's obligations hereunder will cause Company irreparable injury and damage. Company shall, in the event of Artist's actual, attempted or threatened derogation of Artist's obligations hereunder, be entitled to seek injunctive or other equitable relief against Artist in a forum of competent jurisdiction with prior notice to Artist and hearing to prevent Artist's failing to perform hereunder or to prevent Artist's performing for others or granting such rights to others. Resort by Company to equitable relief, however, shall not be construed as a waiver by Company of any other rights Company may have against Artist for damages or otherwise.

### 17. Union Compliance.

The provisions of this agreement shall be subject to the applicable requirements of Company's agreements with labor organizations, if any. In accordance with law, Artist will remain, or become and remain, a member of any labor organization, if any, with which Company or a borrower or assignee of Artist's services hereunder has an agreement lawfully requiring Artist's membership.

### 18. Assignment.

Artist recognizes that Artist's services and the material, if any, to be furnished hereunder are of a unique, extraordinary, intellectual and personal character which gives them a peculiar value, and therefore agrees that this agreement may not be assigned by Artist; Artist agrees, however, that Company may assign this agreement or any part or parts of Company's rights herein, including without limitation, the right to have Artist perform – the services specified herein, to a party controlling or acquiring Company, controlled by Company, under common control with Company or

authorized to provide employment or payroll services to Company, provided that such assignment shall not relieve Company of its obligations hereunder.

### 19. Insurance.

Company may, at its own expense and in its own name or otherwise, apply and take out life, health, accident or other insurance covering Artist for any sum which Company may deem necessary to protect its interests hereunder. Artist shall have no right, title or interest in or to such insurance, but will, nevertheless, assist Company in procuring and maintaining the same by submitting to the customary medical, physical and other examinations and by giving such information and signing such applications, statements and other instruments as may reasonably be required by the insurance company or companies. Artist shall have the right, at Artist's option and sole expense, to have Artist's physician present at any such examinations.

### 20. First Negotiation and First Refusal.

(a) At Company's request at any time or times during the term, Artist shall negotiate in good faith with Company with respect to the terms and conditions for Artist's rendering services on behalf of Company subsequent to the term. Artist may not negotiate with others, unless and until, on the day thirty (30) days prior to the expiration of this agreement, Artist and Company have not reached an agreement under which Artist shall continue to provide services to Company subsequent to the term of this agreement.

(b) At no time prior to a date of one hundred and eighty (180) days subsequent to the term hereof or cessation of Artist's employment with Company, whichever comes later, may Artist furnish or agree to furnish to any other person, firm or corporation Artist's services in television, sound radio or new media, without giving Company the first opportunity to enter into an agreement with Artist therefor on terms and conditions at least as favorable to Company as those offered to Artist by any such other person, firm, or corporation (which Artist is willing to accept) or by Artist to such other person, firm, or corporation (which he/she, they or it is willing to accept). Company shall have ten business (10) days from the date of receipt of written advice from Artist of any such offer (containing full details in regard thereto) in which to accept or reject same. Company shall be deemed to have accepted said offer by acceptance of the terms thereof reducible to a determinable

7

amount of money.   Artist shall not enter into any such agreement, and Company shall not be required to meet the provisions of any such offer, unless it has been reduced to writing, signed by the offeror, and delivered to Company with offeree's written acknowledgement of willingness to accept same.   If Company rejects said offer or fails to accept the same within the time above specified, then and then only shall Artist be free to furnish or agree to furnish such other person, firm, or corporation Artist's services in television, sound radio or new media. If Artist does not accept such offer, the terms hereof shall apply to any subsequent offer received by or made to Artist during the matching period specified above.   Company's failure to accept shall not constitute a waiver of first refusal with respect to subsequent offers during the matching period specified above.

(c) Artist understands and agrees that, prior to the end of the term of this agreement or cessation of Artist's employment with Company, whichever comes later, Artist will not contract, offer to contract or negotiate with any third party concerning Artist's services (except as may be expressly permitted elsewhere in this agreement) or engage in any other conduct that is intended to or has the effect of circumventing Company's rights under this paragraph 20 or that is intended to or has the effect of interfering with Artist's ability to satisfy all of Artist's responsibilities or obligations under this paragraph 20.

## 21. Federal Communications Act.
Artist understands that it is a Federal offense, unless disclosed to his or her employer or to the network prior to telecast, to:

(a) Give or agree to give any member of the production staff, anyone associated in any manner with the program, or any representative of the network any portion of Artist's compensation or anything else of value for arranging Artist's appearance on the program.

(b) Accept or agree to accept anything of value, other than Artist's regular compensation for services on the program to promote any product, service or venture on the air, or use any prepared material containing such a promotion where Artist knows the writer received consideration for it.

Artist shall notify Company immediately if any person attempts to induce Artist to do anything in violation of the foregoing or which is in any way dishonest.

## 22. Notices.
Any notice hereunder shall be in writing and shall be given in person, by facsimile transmission, by postpaid or overnight express mail addressed to the respective addresses stated on the first page of this agreement or at such other address as may be specified in writing by the party to whom the notice is given, or if to Artist, Artist's address currently on file with Company.  When a notice is given by mail or by facsimile transmission, the date of mailing or facsimile transmission shall be deemed the date of giving such notice.

## 23. Separability and Reformation.
(a) If any tribunal of competent jurisdiction finds that any provision(s) of this agreement fails to conform to the law, any such provision(s) shall remain in effect but shall be reformed by such tribunal, by being amended, to the smallest possible extent, in order to conform.

(b) If any provision of this agreement can not be reformed so that it does not violate or require either party to violate any applicable laws, to that extent such provision shall be of no effect. All other provisions of this agreement shall remain in full force and effect.

## 24. Rights Cumulative.
Each party's respective rights hereunder are cumulative, and the exercise of one right will not be deemed to preclude the exercise of any other rights; likewise, it is agreed that a party's rights hereunder are in addition to any other rights that party may have at law or in equity.

## 25. Waiver.
The waiver of any breach of this agreement shall not constitute a waiver of any subsequent breach.  Any such waiver must be in writing to be effective.

## 26. Definitions.
The terms "television," "cablecast," telecast," or "broadcast" as used herein shall include, without limitation, all present and future forms of transmission of "live" or recorded sounds and images (black and white or color) through the air or by wire or by any other method or by any combination thereof, whether now known or hereafter discovered intended for any type and manner of reception (including without limitation community antennae and similar systems with or without fee) in any place whatsoever, whether for reception free or on subscription or other charge or fee or for reception at places where admission is charged,

8

and shall include recordings of, or prepared for or in connection with, such transmissions, either in whole or in part, directly or indirectly, and shall include recordings of sounds and images for sale, rental or other form of distribution of copies of such recordings to the public for home or similar use.   The terms "sound radio" or "sound radio broadcast", as used herein, shall include, without limitation, all present and future forms of transmission of "live" or recorded sounds through the air or by wire or by any other method or by any combination thereof, whether now known or hereafter discovered and shall include recordings of, prepared for or in connection with such transmissions, either in whole or in part, directly or indirectly.   The terms "new media" and "interactive media" as used herein shall include, without limitation, all present and future forms of the dissemination and/or receipt of any kind of audiovisual content such as text, software, images and sounds by way of interactive television, the Internet, Intranets, Intercast, on-line services, Bulletin Board Systems, cartridge or CD-ROM based video game systems, PC-based executions, kiosks, DVD, Divx, CD-I, CD HD, CD-ROM, CD-ROM-XA, 3DO, CD-Plus, CD-TV or the like and any subset, format, enhancement or version thereof, whether now known or hereafter discovered.

**27. Pre-Employment Requirements.**
For new hires, this agreement is contingent upon Artist's successful completion of all generally required pre-employment procedures, including, for staff employees, passing a drug screening test.   The original and continuing effectiveness of this Agreement is contingent upon Artist remaining at all times, under applicable law, eligible to perform the services contracted for hereunder in the United States and/or any other location in which Artist may be required to perform services pursuant to this Agreement.

**EXHIBIT B**

**Jones, Melissa (NBC Universal, MSNBC)**

| | |
|---|---|
| **From:** | Kaplan, Rick (NBC Universal, MSNBC) |
| **Sent:** | Tuesday, August 23, 2005 11:29 AM |
| **To:** | Leon, Scott (NBC Universal, MSNBC) |
| **Cc:** | Jones, Melissa (NBC Universal, MSNBC) |
| **Subject:** | FW: |

Are you aware of this?


-----Original Message-----
From: Claudia DiFolco [mailto:claudia_difolco@yahoo.com]
Sent: Tuesday, August 23, 2005 10:07 AM
To: Kaplan, Rick (NBC Universal, MSNBC)
Subject:

hey rick, hope all is well. was at a dinner party on
saturday and ran into a couple of your fans. they had
very nice things to say about you...it seems to keep
happening and its nice. i'll fill you in later.

left a msg at your office yesterday...i'm planning on
working out of nj next friday 9/2, so i can meet with
you, at your convenience, anytime thursday.
unfortunately, it really saddens me to say that after
much considerable thought, it is to discuss my exit
from the shows. you have been nothing but supportive
and mentoring of me since the day we met and i want to
make sure i do this in the least disruptive manner
possible and give you ample time to replace me.

while it would be much easier for me to tell you that
it relates to my upcoming marriage, that couldn't be
further from the truth. i respect you too much to be
anything but sincere and forthcoming. while i disagree
with the manner in which ryan downey addressed his
issues so openly, they did strike a nerve and spoke to
me as symptoms of a much larger problem that i don't
see going away anytime soon.

rick, i really wanted this to work and more
importantly, wanted to be a part of your team for a
long time to come. i'm so sorry.

claudia


_____
Do You Yahoo!?
Tired of spam?  Yahoo! Mail has the best spam protection around
http://mail.yahoo.com

**Rikelman, Julie (NBC Universal)**

**From:** Kaplan, Rick (NBC Universal, MSNBC)
**Sent:** Sunday, August 28, 2005 2:48 PM
**To:** 'Claudia DiFolco'
**Subject:** RE: RE: Toronto change

My complete impression is that you have resigned...and offered the courtesy of working out an exact out-date...I made Scott aware of t6his...and we feel that sooner is better since your obvious intent is to leave. Best for all to do it quickly...

I'm disappointed...to say the least...

-----Original Message-----
From: Claudia DiFolco [mailto:claudia_difolco@yahoo.com]
Sent: Wednesday, August 24, 2005 11:24 AM
To: Kaplan, Rick (NBC Universal, MSNBC)
Subject: Fwd: RE: Toronto change

rick, please see scott's e-mail below. if this is in
response to my e-mail to you and it is at your
direction that i am being being taken off shoots (my
shoot for today was canceled yesterday as well for no
reason), fine, i understand.

however, if you have not made scott aware of my e-mail
to you and this is his response to a critical e-mail i
was forced to respond to yesterday, or is retribution
for some other perceived slight toward him or cass,
then its all you need to know about why i find the
situation intolerable.

to be clear, i did not resign yesterday and was merely
giving you significant notice of my intention so you
could begin thinking about alternatives for next year.
as always, count on my continued professionalism.

if its ok with you, since i just found out scott moved
taping to thursday next week, i'll be in nj for that
and we can meet before or after at your covenience.
please let me know. thanks. claudia

--- "Leon, Scott (NBC Universal, MSNBC)"
<Scott.Leon@MSNBC.COM> wrote:

> From: "Leon, Scott (NBC Universal, MSNBC)"

**Rikelman, Julie (NBC Universal)**

| | |
|---|---|
| **From:** | Claudia DiFolco [claudia_difolco@yahoo.com] |
| **Sent:** | Wednesday, August 31, 2005 12:00 PM |
| **To:** | Kaplan, Rick (NBC Universal, MSNBC) |
| **Cc:** | ken@klateam.com; Jones, Melissa (NBC Universal, MSNBC) |
| **Subject:** | for the record |

Rick,

Your crytpic response to my e-mail once again left me perplexed, but after landing in New York last night for our meeting and getting an obnoxious voice message from Scott, I now understand you do not intend to meet with me as originally planned and want me to deal with human resources. As such, I have copied Melissa herein so this can be our last direct correspondence.

Since we have barely communicated through a few short e-mails, I don't understand how you could have developed such a "complete impression." It was my intention to give you long-term notice that I was terribly disappointed in the way I was treated and was not planning on returning for the second year of my contract. Since you seem to feel it is best for my exit to happen sooner rather than later, despite my continued professionalism and commitment to doing the best job possible until the end of the contract year, I am now under the impression that it is your decision to terminate my employment, which is inconsistent with the document prepared by your lawyers which I was briefly told about last night by my agent. It does not include the rest of your financial obligation to me, nor address the compensatory time I am owed (20 days) for all the 6 and 7-day weeks I have logged so far.

Even if you thought otherwise from my original e-mail (although I remind you that you deferred the issue in your response to me until we were to meet), I sent you a second follow up within 24 hours right after your conversation with my agent in which I clearly reiterated that it was not my intention to resign early, only to give you the courtesy of long-term knowledge. I was prepared for my upcoming stories and going to work when they were immediately cancelled. So we went from your agreement to meet with me to discuss the issues to you now having a "complete impression" of my resignation, which was never given, and to you now having no interest in doing this directly, quitely and professionally. Even if you were unclear from my original e-mail, which your response indicates is not the case, what part of "I did not resign yesterday and was merely giving you significant notice of my intention so you could begin thinking about alternatives for next year" in my follow-up did you not understand? No notice was given; no formal letter of resignation was sent. No time frames were offered. I was simply giving you the courtesy of knowing I should not be in your long-range plans. Like the expression goes, no good deed goes unpunished; and courtesy is clearly not a two-way street with you.

That all being said, I must let you know that I am the one who should be and is most unhappy in what has transpired and how it is now being handled. I am certainly losing far more than you, and only came to this conclusion after many sleepless nights. I am the one walking away from a job without another option. To try to blame me for cutting my losses and planning to leave a bad situation which I did not sign up for is inappropriate, at best, and I cannot allow it to go unchallenged. For the record, I DID COME TO YOU FIRST. I brought an incident to your

attention a few months ago and advised you that if not dealt with, it would escalate.  You did nothing.

Did you not realize that a correspondent you hired and complemented directly and in e-mails was being phased off the shows?  Did you even see any of the shows after the first few weeks, when your follow up critiques stopped coming?  Did you think it was better having an unexperienced producer, who is supposedly there to schedule my shoots, do on-air stories and cancel mine while I sat idly by looking to contribute?  Was I supposed to tolerate a producer who hired a personal friend as a PA to do nothing but join her in smoke breaks? (Unfortunately, the dynamic was such that if I addressed the issue with Scott it would surely have only created further problems for me.)  Why were my producers looking for every opportunity to minimize my role while you were looking to find me more opportunities, as with the Tucker Carlson show?  Surely you remember how Scott showed his frustration with your admonishment of him by lashing out at me for following YOUR direction in doing the Tucker shoots.  Did you not understand the compromising position you put me in by telling me to ignore my direct boss on the issue?  Did I not warn you that Scott's bad feelings would fester and create problems?  To say that the episode was dysfuncitonal would be an understatement.

I offered you the courtesy of getting together privately to point these things out so you could understand why someone like me, who you have have continually acknowledged to be talented, hard working and committed, has reached this point.  Also, hopefully, to avoid a recurrance of this type of situation in the future.  That was for your benefit; I had nothing to gain from it.  Since you are not interested, it further confirms my belief that I made the right choice in leaving a bad situation.  It seems to me a good manager would at the very least want to conduct an exit interview to understand what went wrong, not just assume the departing employee is in the wrong.  It is even more unfathomable to think that you would not want to do so when I am the second on-air correspondent in two weeks to reach the breaking point with management.  Do you really believe Ryan and I were the problems and these are going to be isolated incidents?  You certainly never expressed a concern that I was an issue before.  I know it is now easier to use revisionist history to blame me for being "disappointing," and support Scott and company. Unfortunately, it won't solve your problems.  Did you really expect me to respect and work for a boss (Scott) whose boss (you) denigrated and made fun of him from the beginning?  Do you think anyone else can respect him under those circumstances?  You even asked me to treat Scott delicately, yet you expected me to commit to his direction.  In hindsight, it is easy to see why this was doomed from the beginning.  Why should I, or anyone else, respect him if you don't.  Yet I tried so hard to make it work.

I had always planned to fulfill the time I committed to the shows for the rest of the contract year, and nothing I wrote to you confirms anything otherwise.  It's what I'm supposed to do; its my responsibility, and I take it seriously.  To suggest I resigned may be more convenient for you, but it is factually incorrect.  Since you can't face the issue directly with me and resolve this quickly and amicably, please have someone let me know what my responsibilities are going forward.  If you don't intend to use my services as a correspondent any further, as everything you have done indicates, then I would expect you to honor my contract and we can then both move on.  Unfortunately, your knee-jerk reaction has now escalated this situation well beyond where it needed to be.

Also, I suggest you keep your personal feelings of "disappointment" out of this; they are clearly clouding your judgment.  A few weeks ago you wanted to buy me dinner, and now you can't face me.  Yes, Rick, I'm disappointed, too....in your attempts to manipulate my words and intentions for your benefit, at how you helped fuel a situation you could have easily rectified but

instead ignored and allowed to continue, and at how you refused to deal with this positively and amicably; read my first e-mail to you - I bore no animosity, and I only asked for the same in return.  Mostly, I'm disappointed that I wasted a year of an otherwise enjoyable, successful, personally satisfying, and consistently ascending career (with an impeccable record of performance and relationships with co-workers) on a rudderless ship bound for nowhere.  But none of that is relevant anymore.  What is relevant is contractual commitments, and MSNBC has one to me.

I am not another Scott.  I will not be bullied or intimidated any further.  Hopefully, now you really do have "a complete impression"...to say the least.  Remember, I offered you the opporturtunity to hear this privately first.

claudia

**"Kaplan, Rick (NBC Universal, MSNBC)" <Rick.Kaplan@MSNBC.COM>** wrote:

> My complete impression is that you have resigned...and offered the courtesy of working out an exact out-date...I made Scott aware of t6his...and we feel that sooner is better since your obvious intent is to leave. Best for all to do it quickly...
>
> I'm disappointed...to say the least...
>
>
> -----Original Message-----
> From: Claudia DiFolco [mailto:claudia_difolco@yahoo.com]
> Sent: Wednesday, August 24, 2005 11:24 AM
> To: Kaplan, Rick (NBC Universal, MSNBC)
> Subject: Fwd: RE: Toronto change
>
> rick, please see scott's e-mail below. if this is in
> response to my e-mail to you and it is at your
> direction that i am being being taken off shoots (my
> shoot for today was canceled yesterday as well for no
> reason), fine, i understand.
>
> however, if you have not made scott aware of my e-mail
> to you and this is his response to a critical e-mail i
> was forced to respond to yesterday, or is retribution
> for some other perceived slight toward him or cass,
> then its all you need to know about why i find the
> situation intolerable.
>
> to be clear, i did not resign yesterday and was merely
> giving you significant notice of my intention so you
> could begin thinking about alternatives for next year.
> as always, count on my continued professionalism.
>
> if its ok with you, since i just found out scott moved
> taping to thursday next week, i'll be in nj for that

**EXHIBIT C**

# Welcome to the TVSpy Watercooler Message Board.

**ADS BY GOOGLE**

**Dish Digital Television**
Digital television service; HDTV, cable sports, movies, interactive.
www.dishdigitaltv.com

**Why Get Cable?**
Will cable give you all this Free? 4 Rooms, DVR, HD, Local Channels
www.whygetcable.com

Welcome to the TVSpy Watercooler, your forum for TV news industry discussions. Share information, get advice for your career and more with the Watercooler.

- Posting messages is FREE on the Watercooler.
- Reading messages posted within the last 48 hours is FREE.
- Reading message archives older than 48 hours is restricted to TVSpy Gold Members.

This message board is designed for a community of insiders and observers. While we are not in the censorship business, we reserve the right to delete or modify off-topic posts or posts that violate the **Rules of the Board**. The opinions expressed on this board reflect the opinions of the participants and not of its sponsor.

If you have questions about our message boards, contact our **Customer Service Department**.

**ADS BY GOOGLE**

**News Anchor Salary**
Visit HotJobs Today - Get Salary Info, Search Job Listings & More!
www.hotjobs.com

**Time Warner Cable**
300+ channels, record and pause live TV with DVR, Movies on Demand.
www.timewarnercable.com

**Television News**
News, Interviews, Filmographies, & Photos€"only from MSN Entertainment
Entertainment.MSN.com